(Nos. 87-CC-0569, 87-CC-2459 cons.—▮▮▮▮▮▮▮▮▮▮▮)

GORDON G. GASS and VIC ECKMANN, Claimants, *v.*
THE STATE OF ILLINOIS, Respondent.

*Opinions filed December 7, 1990.*

*Order on petition for rehearing filed March 29, 1991.*

*Order on petition for rehearing filed May 14, 1992.*

HARRY J. STERLING, for Claimants.

NEIL F. HARTIGAN and ROLAND W. BURRIS, Attorneys General (TERENCE J. CORRIGAN, Assistant Attorney General, of counsel), for Respondent.

## OPINION

Patchett, J.

This case arises out of an alleged flooding of farmland during the construction of Interstate Highway 255 at Interstates 55 and 70 in Madison County. Claimant alleges that the construction caused flooding, and subsequent damage, to his crops and farmland.

Claimant alleges crop losses of $7,472.00. On July 28, 1987, Claimant filed an amended complaint; and on October 20, 1987, he filed an amendment to the amended complaint. The amendment charged a second flooding of the farmland in July of 1987, and sought additional damages of $5,430.00.

The Claimant, Vic Eckmann, owns an undivided one-half interest in 40 acres of farmland involved in this

cause. Claimant farms this property alone, and has done so for 20 years.

This case involves the drainage of Schneider Ditch in relation to Claimant's property. The Schneider Ditch originates close to Illinois Highway 157 West and the eastern bluff of the Mississippi River Valley. The ditch runs west from its origin under Interstate 255, under a road called Black Lane, and next to Claimant's land where it takes a turn south and finally drains into Brushy Lake by going under a farmer's field road. That portion of Schneider Ditch that flows south is located just on the east side of Claimant's 40-acre tract of land. To the west of Highway 157 is a frontage road under which there is a double 10 × 5 box culvert. The distance of Schneider Ditch from the frontage road to I-255 is 4,100 feet, from I-255 to Black Lane 1,100 feet, and the distance from Black Lane to the farmer's field road is between 1,000 and 2,000 feet. The entire length of Schneider Ditch is approximately one mile to Black Lane. The flow is downhill from the bluffs to Black Lane. To the north of Schneider Ditch, and running in a westerly direction, is a creek known as Schoolhouse Branch. Schoolhouse Branch empties into Cahokia Canal which is located to the west of Claimant's 40-acre tract.

The Schneider Ditch is fed by water coming off of the bluffs to the east as well as by drainage off of Interstate 255. Schneider Ditch is also fed to some extent by Schoolhouse Branch through fields between the two courses of water. Schoolhouse Branch is also fed by water coming off of the bluffs to the east of Illinois Highway 157.

The Claimant has been in farming for 30 years, and is also in the irrigation business. Claimant has been familiar with Schneider Ditch all of his life.

In April of 1986, and again in the fall of 1986, IDOT acquired a temporary construction easement to clean out Schneider Ditch. Pursuant to this easement, IDOT cleaned out Schneider Ditch from the frontage road by the Interstate all the way down to Black Lane. At the time of cleaning, one $5 \times 10$ foot side of the double box culvert underneath the frontage road was completely cleaned while the other side was completely silted shut. There was about a 50-square-foot opening underneath the frontage road. After the cleaning out by IDOT, the open side of the box culvert under the frontage road was still completely open, but in the years after, the open side silted up to the point where only a 2 to 2½ foot $\times 5$ foot opening remained open. IDOT left the one culvert closed to retain water on IDOT land and reduce the flow of water west of the frontage road.

Prior to the cleaning of the ditch, the ditch was filled with brush, weeds, trash, and other debris to the extent that it was impassable for a man. The flow of water through the ditch was impeded. After cleaning out the Schneider Ditch, IDOT left the ditch very clean and smooth with tapered sides all the way from the frontage road to Black Lane. In addition to cleaning out the ditch, IDOT constructed I-255 where it dissected Schneider Ditch. Prior to the construction of Interstate 255, rain falling at that location fell on flat farmland and entered Schneider Ditch as surface drainage. As a result of the construction of I-255, rain water hits its pavement and the slopes of its 50-year storm ditches, and this water drains through 50-year storm ditches into Schneider Ditch.

Also prior to the actions taken by IDOT, the five-foot-diameter culvert underneath the farmer's field road was half silted and closed and remained so at the time of the hearing in this cause.

Rainfall that hit I-255 and the slopes of its 50-year storm ditches now enters into Schneider Ditch more quickly than it did prior to the construction of I-255. The flow of water through Schneider Ditch from the frontage road all the way down to the farmer's field road flowed at an increased velocity as a result of the cleaning process.

Claimant's 40-acre tract flooded in October 1986 and again in July of 1987. The representatives of IDOT were told by Claimant and his father that the property would flood if a pumping station were not put in where Schneider Ditch curves from west to south. The representatives of IDOT were aware that the flow through Schneider Ditch would be quicker and that it would be expected to flow through the 165-square-foot opening underneath I-255 to a 100-square-foot opening underneath Black Lane down to a half-silted five-foot-diameter culvert underneath the farmer's field road.

Claimant's 40-acre tract flooded approximately four or five times in the previous 20 years prior to the cleanout of Schneider Ditch by IDOT. Some of these prior floods were caused by defective levees of the Schoolhouse Branch. The 1986 and 1987 flooding came from the north of the 40-acre tract. The problems with Schoolhouse Branch were repaired by the levee district prior to the fall of 1986. While the property flooded in 1984 after the Schoolhouse Branch had been repaired, that flooding was not nearly as severe as the floods occurring after the Schneider Ditch was cleaned out. In October of 1986, the property stayed flooded for about two weeks. After the 1984 flood, Claimant did extensive ditching on his property, which enabled his 40-acre tract to withstand the rains of 1985.

After Schneider Ditch was cleaned out in October

of 1986, and again in July of 1987, Schneider Ditch almost topped the large culvert underneath Black Lane. Instead of the flow making the 90-degree south turn in Schneider Ditch, it came straight across the levee onto Claimant's 40-acre tract. The 40-acre tract was flooded with three to five feet of water in October of 1986.

Frank Opfer, a hydraulic engineer for the State, testified that in his opinion the work done on the construction of Interstate 255, and the cleaning out of the Schneider Ditch, did not increase the volume of water flowing into Schneider Ditch. He further testified that the flooding of Claimant's property in his opinion was caused by the fact that the culvert, only five feet in diameter, which Claimant installed under the farmer's field road, was insufficient to handle the natural flow of water through Schneider Ditch. The five-feet-in-diameter culvert under the farmer's field road was, and is, silted approximately half closed, reducing the flow of water through the culvert. Opfer testified that in his opinion the flooding was not caused by any of the work done by the Department of Transportation.

Prior to the October 8, 1986, flood, Claimant had planted winter wheat on his 40-acre tract. As a result of the flood, Claimant's entire crop of winter wheat was lost, and therefore the net profit Claimant would have realized on that crop was also lost. Claimant's evidence showed he would have realized a gross profit of $6,266.00 using an average of 65 bushels per acre as the estimated bushels he would have realized if the crop had grown. With labor costs of $1,900.00 and seed costs, he would have realized a net profit of $4,366.00. Claimant estimated his yield at 65 bushels per acre based on his past experience with this particular variety of wheat. Claimant would have received $2.41 per bushel for his

wheat had he been able to harvest it, according to his evidence.

In addition to the lost profit on the Claimant's wheat, Claimant incurred additional damages. Claimant prepared the 40-acre tract in order to replant winter wheat after the flood. Although the tract dried enough to run a disk over it and cultivate it, it never was dry enough to plant. Rains that fell after the preparation efforts by the Claimant made it impossible to replant.

Claimant seeks additional damages for ground preparation costs for winter wheat. His testimony was that damages for this were $2,650.50. In preparing the ground for the second planting of winter wheat, Claimant mowed the tract once, disked it three times, cultivated it twice, and ran rotary over it. In order to replant the crop, these ground preparation procedures had to be employed. Claimant's exhibits show the cost of mowing at $5.00 per acre, the cost of disking at $6.00 per acre, the cost of field cultivation at $5.25 per acre, and the cost of rotary at $5.25 per acre, which nets a total cost for ground preparation incurred by Claimant at $1,550.00. Claimant proposes that the costs as aforesaid and in his exhibits are stated in 1977 dollars and therefore the total figure must be increased by 71.7% to reflect 1986 dollars. Claimant's total damages claimed as a result of the flood on October 8, 1986, are $7,016.50.

Claimant's 40-acre tract flooded again in July of 1987. Claimant had prepared the tract for planting soybeans. The property flooded in July of 1987 before Claimant could plant his crop. Claimant therefore lost the net profit he would have made on the crop. Had Claimant been able to plant his 1987 soybean crop, he would have received a gross profit of $11,000.00, less production costs of $5,589.00, for a net profit of $5,420.00.

Had Claimant been able to plant and to harvest his crop, he would have incurred preharvest operating costs consisting of $500.00 for seed, $1,000.00 for herbicides, $480.00 in miscellaneous expenses, $760.00 in preharvest machinery operations, and interest on preharvest operating capital of $168.00 for a total preharvest operating cost of $2,908.00. Had Claimant been able to plant and harvest his soybean crop, he would have also incurred harvesting costs of $2,680.00. But for the July 1987 flood, Claimant would have realized a yield on his soybean crop at 55 bushels per acre which he could have sold at $5.00 per bushel, times 40 acres, for a total gross profit of $11,000.00. Claimant estimated the yield per acre based upon his past experience with soybeans on that tract. The highest yield he has ever gotten in soybeans is 65 bushels per acre, and the lowest he has ever gotten is 50 bushels per acre. The price per bushel for soybeans in 1987 was $5.00 per bushel. Normally soybeans are planted no later than June of the year. Claimant had not planted his soybeans by June of 1987.

Total damages sought by Claimant for the two floods total $12,436.50. Claimant has also requested that he be allowed to amend his complaint to seek an injunction against the State from flooding his land. The motion was taken with the case.

There is no question that Claimant's 40 acres flooded and two crops were lost. There is no question that the State cleaned out the Schneider Ditch from the bluffs all the way down to Black Lane, but did not clean out the ditch west of Black Lane. The State also knew prior to the cleaning out of the portion of Schneider Ditch that the water would flow downhill through first a 165-square-foot opening beneath I-255 down to a 100-

square-foot opening underneath Black Lane and then flow through an unclean portion of the ditch, make a 90-degree left turn, and flow to and through a five-foot-diameter culvert under the farmer's field road and that culvert was half-silted shut. The State was warned prior to the cleaning out of the ditch that a flooding of the Claimant's land would occur without a pumping station being built at the 90-degree turn to pump water into Cahokia Canal. The State took the position that such a pumping station was too expensive and not required.

In order for a claimant to recover in such a case against the State, the claimant must prove that the State was negligent, and that such negligence caused the damages complained of. The issue of comparative negligence must also be addressed. *Bundy v. State* (1986), 39 Ill. Ct. Cl. 87.

The issue presented is whether the State has caused additional waters to enter Schneider Ditch upstream, and at a greater velocity, so that flooding is caused on Claimant's land. *Dugosh v. State* (1985), 37 Ill. Ct. Cl. 168.

One who negligently alters the natural flow of water on the property of an adjacent landowner and thereby causes damages is liable to the adjacent landowner. *Mount v. State* (1977), 31 Ill. Ct. Cl. 299; *Branding v. State* (1977), 31 Ill. Ct. Cl. 455; *Vickroy v. State* (1977), 31 Ill. Ct. Cl. 489; *Sharpe v. State* (1984), 36 Ill. Ct. Cl. 108.

In the present case, the State cleaned out only a portion of Schneider Ditch. The State also put in a 165-square-foot culvert opening under I-255 during its construction. It was foreseeable that this culvert narrowing down to a 100-square-foot opening at Black

Lane to a five-foot-diameter culvert under the field road would cause flooding on the Claimant's land. It is clear the State was warned of the potential flooding by Claimant. The State's position that the closed culvert by the frontage road would hold back enough water on IDOT property so that only the natural drainage would proceed down Schneider Ditch past the new interstate is just plain wrong, as shown by the flooding of Claimant's land. (*Emerson v. State* (1975), 30 Ill. Ct. Cl. 420.) The State altered the natural flow of Schneider Ditch when the Interstate was built and the 165-square-foot culvert opening was put in place. The State should have known that cleaning out only a portion of Schneider Ditch would cause the flooding which occurred. The State was negligent and that negligence caused the damages to Claimant.

Claimant presented adequate and substantial proof of his damages totaling $12,436.50. These figures were not contested by the State. However, the issue of comparative negligence remains. (*Guffey v. State* (1987), 40 Ill. Ct. Cl. 179.) In the face of the State's actions of cleaning out Schneider Ditch against the warnings of Claimant, Claimant failed to clean out the five-foot-diameter culvert under his farmer's field road prior to the first flooding. A reduction of the fall damages of 10% for this contributory negligence is appropriate. The Claimant is in the irrigation business. He again failed to clean out the five-foot-diameter culvert under his field road after the first flood. A 15% reduction of the July 1987 damages is appropriate. We award the Claimant the sum of $10,921.85 in damages.

The Claimant also seeks an injunction against the State in the Court of Claims enjoining the State from flooding his land. The Court of Claims has only that

jurisdiction established by statute. (*Harbour v. State* (1986), 39 Ill. Ct. Cl. 58; *Nevlon v. State* (1986), 39 Ill. Ct. Cl. 63; *Tedder v. State* (1988), 40 Ill. Ct. Cl. 201.) Chapter 37, section 439.1 *et seq.*, of the Illinois Revised Statutes provides no jurisdiction of the Court of Claims to issue injunctions against the State. The Court of Claims is not a court of general jurisdiction. (*National Railroad Passenger Corp. v. State* (1983), 36 Ill. Ct. Cl. 265.) Therefore, we deny the Claimant's motion to amend his complaint, and we specifically deny any injunctive relief.

## OPINION

PATCHETT, J.

This case arises out of a claim filed by Gordon Gass alleging flooding on his farm as a result of construction work on Interstate 255, at Interstate 270 and old Route 66 in Madison County, Illinois. The Claimant alleges that the flooding caused damage to his crops. A hearing was held before Commissioner Frederick of this Court. Extensive evidence was admitted, including a discovery deposition of Frank Opfer taken May 15, 1989, transcript of evidence on June 21, 1989, departmental report filed on or about October 22, 1987, and exhibits by both the Claimant and Respondent. Briefs were filed by both parties.

Gordon Gass farms a 79-acre tract of land, known as "Faber Farm," on the north side of I-270 in Madison County, Illinois. In the spring of 1985, the field flooded and his crop was lost.

The 79-acre tract at issue is bounded to the south by I-270, to the north by old Route 66, to the east by County Ditch (also referred to as Cahokia Canal), and to the

west by the land of another property owner. Along the 79-acre tract Claimant was farming, the County Ditch runs in a north-south direction while I-270 and old Route 66 run in an east-west direction. The tract of farmland is located in what is called the American Bottoms which is bounded by the Mississippi River to the west and the eastern bluffs of that river valley.

The Claimant has farmed in this general vicinity for 30 years. County Ditch is operated by farmers in the area, and Gordon Gass has been a trustee for the drainage district for 37 years. The Claimant has been observing these levees and ditches in the area for over 30 years.

In the spring of 1985, the Illinois Department of Transportation did construction work on Interstate 255 at the interchange with I-270. The State acquired property on both the north and south of Interstate 270 for acquisition of Interstate 255. Improvements were made along Interstate 270, and particularly at locations to the south of the 79-acre tract in question, in connection with the I-255 improvement.

In doing this construction, IDOT removed a flap gate located at the intersection of the County Ditch with a pre-existing ditch running westerly from the County Ditch, and located south of the frontage road on the south side of Interstate 270. IDOT constructed a new ditch immediately south of the frontage road, which was connected to the County Ditch where the flap gate was removed.

Leland Jones testified that he had installed the flap gate in question that was removed by IDOT. The culvert on which the flap gate was installed connected a drainage ditch on the State's right of way along Interstate 270 with the County Ditch. The County Ditch

turns into the Cahokia Canal and eventually empties into the Mississippi River. Occasionally, when there is a general rainfall over the whole area served by the Cahokia Canal, the canal will be unable to accommodate the flow and water will back up the canal, flowing north, rather than south as intended. Claimant installed the flap gate to stop the back flow of water in the canal from entering upon his land. A flap gate allows water to flow in only one direction and shuts if there is a tendency for water to flow in the opposite direction. The ditches on each side of the frontage road were connected with newly-installed pipe under the frontage road in 1985. These ditches were in turn connected with the Faber Farm on the north of I-270 by a culvert.

Leland Jones had installed other flap gates for Gordon Gass. Mr. Jones has been a self-employed excavating contractor since 1976, but has been in the excavation business since the late 1940s. After the removal of the flap gate by IDOT, Claimant was concerned that the property would flood if Cahokia Canal backed up because IDOT had left no restrictions to the back flow of water between County Ditch and the 79-acre tract. Claimant caused his concerns to be made known to the representatives of IDOT, and he advised them that flooding might occur. In response to these warnings, IDOT agreed to plug the culvert under I-270 leading to Claimant's tract with sandbags by May 1, 1985.

Claimant and Leland Jones both testified that in the spring of 1985, after removal of the flap gate, water flowed through the culvert, from which the flap gate was removed, under the Interstate, and then onto Claimant's field. Claimant believes the flooding took place in May. According to Claimant, the flooding had to take

place in the middle of May or later, because the crops had been planted in May and were already growing when the flooding took place. Leland Jones testified that the flooding he observed was in April or May of 1985. Jones testified that water was coming onto the field from the culvert from which the flap gate was removed, as well as from another location which was unaffected by the removal of the flap gate. Neither Claimant nor his witness, Leland Jones, could give a date for the actual flooding. While no exact date can be given, it is clear that the 79-acre tract flooded. The issue is why. The State's theory is that the County Ditch overflowed its banks and flooded the Claimant's land. The Claimant says the water from the County Ditch flowed west past the spot where the flap gate was removed and then under the frontage road, under the Interstate, and then onto the field.

The State's hydrological engineer indicated that westward flow of this water through these ditches was to be expected given the fact that the County Ditch was full and the flap gate was removed. If IDOT had not removed the flap gate, water would not have been able to reach the culvert under I-270.

The flooding was first noticed by Claimant, according to his testimony, on a Friday morning in May. Claimant was out to this property frequently over that weekend and testified he observed the flow through the culvert under I-270 directly onto his field. Claimant observed a strong flow and volume of water coming onto his land through the culvert. Leland Jones also testified that he observed the flow of water from County Ditch, backing up into the new ditch constructed by IDOT, and flowing onto the field through the culvert under I-270. As a result of this intense three-day flow

through the culvert under I-270 onto Claimant's field, his 79 acres remained flooded for approximately one week.

The representative of IDOT testified he saw some leakage onto the field through the culvert. The flow through the culvert underneath I-270 stopped flowing onto Claimant's field on the next Monday. Also as a result of the removal of the flap gate, water backed up the 270 channel from the west of Claimant's tract to the interchange of 270 with I-255, and proceeded around the on ramp from 255 to 270. According to Claimant, this water flowed behind levees to farms to the west of Claimant's tract, to other culverts underneath I-270 to the extreme west of Claimant's tract, and carried water on around to the north of Claimant's tract, providing an additional source of flooding.

According to the State's engineer and representative, the culvert in question was plugged with sandbags on Thursday, May 9, 1985. They felt that the sandbags were effective in plugging the culvert. In June of 1985, the State's records showed that flooding occurred when the Cahokia Canal overflowed its banks. On that occasion, the culvert was again sandbagged. The property in question lies on a flood plain, and was flooded in the spring of 1984, before the State removed the flap gate. It was also flooded in November 1985, when Cahokia Canal overflowed its banks.

Frank Opfer, District 8 hydraulic engineer for the Department of Transportation, testified that if water flowed through the culvert at maximum capacity with the Cahokia Canal full to its banks, it would take 56 hours to flood the property in question. A back up of water along the Cahokia Canal, and subsequent overflowing, could be caused by the Army Corps of

Engineers stopping the flow water from the canal into the Mississippi River.

There is a major dispute in the testimony before the Court as to whether the culvert underneath I-270 leading onto Claimant's land was sandbagged before the flood. The Claimant and Leland Jones testified they were at the tract and observed the flooding during the spring weekend. They consistently claimed that they saw no sandbags in place. The resident engineer for IDOT, Jim McAdams, testified that the north side of the culvert was plugged on May 9, 1985. Jim McAdams did not inspect the sandbags during the rain, but he testified that they were effective. No State representatives were at the site over that weekend that Claimant claims the land flooded.

The State's hydraulic engineer testified that the water had to have come from another source rather than the culvert under I-270, as the maximum rate of flow would have been 20 cubic feet per second. To flood the 79 acres, a volume greater than four million cubic feet would have been required, and would have taken at least 56 hours to flood the 79 acres. The State's hydraulic engineer figured the maximum rate of flow based upon the maximum elevation that the water could reach without topping the levee of County Ditch. The elevation that the engineer used for the levee of County Ditch was that elevation of the levee at the intersection of the County Ditch with Interstate 270, and not the actual elevation of the levee to the north of 270 immediately next to Claimant's 79-acre tract, which might have been a higher elevation. The State's analysis did not take into consideration sources other than the culvert under I-270 which contributed to the flooding. The actual duration of the flow through the culvert

underneath I-270 was longer than 56 hours, since it was observed from a Friday morning until it stopped on the following Monday.

The State's expert stated that the culvert underneath I-270 was plugged with sandbags and therefore the County Ditch must have topped over its levee to cause the flooding. Claimant testified that the sandbags were not holding if they were in fact so placed. Claimant and Leland Jones were at the tract during the weekend of the continuous flow through the I-270 culvert, and both testified they did not see the County Ditch topping its levee. Jim McAdams for the State testified he saw the County Ditch top its levee on June 11 and November 20, but these were not the dates of the alleged flooding.

When the property flooded, Claimant lost his crop of winter wheat of 23 acres, and his crop of soybeans of 56 acres. Claimant replanted the tract in soybeans. Claimant testified that the late planting of the crop resulted in a reduced yield. Claimant relied upon an agricultural report in calculating his reduced yield and operating costs. Claimant would not have planted soybeans on the 23 acres of winter wheat if he had harvested the wheat. Claimant based his estimates of the value of the crops on the price he received when he sold his previous year's crop. Claimant did not know what he received when he sold his 1985 crops. Claimant also incurred damages by reworking the field for planting, planting the field a second time, and using additional soybean seed.

Claimant testified that his total loss on the soybean crop from the decreased yield was $4,368.00, which was derived by calculating a 13-bushel-per-acre decrease multiplied by 56 acres multiplied by a price of $6.00 per bushel for soybeans. He also included using additional

soybean seed for the second planting at a total of $392.00, which was calculated by the total requirement of 56 bushels of soybean seed at $7.00 per bushel, reworking the field a second time for a total cost of $560.00, which cost $10.00 per acre at 56 acres, and planting the beans a second time at a cost of $280.00, which was calculated at a cost of $5.00 per acre for 56 acres. In calculating the decreased yield, the costs for reworking the field, and the cost of the second planting, Claimant relied upon *Doane's* agricultural report. *Doane's* is a farm publication that has been in business over 75 years. It is a resource which farmers rely on to figure cost data in the farming business.

The price per bushel of soybean seed was $6.00 per bushel. The cost of soybean seed was $7.00 per bushel. Soybean seed must be cleaned before planting, and this service costs 40 cents a bushel.

Claimant's 23 acres of wheat was also flooded, so he disked it and planted beans on those 23 acres. Claimant had claimed only the loss of wheat as damages rather than also adding the cost of replanting beans on those 23 acres. Claimant testified he was damaged in the amount of $4,830.00 for the loss of his 23 acres of wheat which would have yielded 60 bushels at $3.50 per bushel. Claimant's average yield on wheat was 67.35 bushels per acre, but he only used a figure of 60 bushels per acre for purposes of calculating his damages. Claimant used a price of $3.50 per bushel, although his grain wheat contracts indicated he was obtaining $3.76 and $3.80 per bushel. Pursuant to Claimant's testimony, his total losses as a result of the May 1985 flood were $10,430.00. Claimant did not subtract the benefit of the soybean yield on the wheat acreage in computing his loss.

Claimant's weakest point is that he cannot testify with much accuracy as to when the flooding occurred. Claimant's Exhibit 4 lends help to the Court in determining the facts of this case. The pictures were developed some time in May of 1985, as marked on the reverse side of the pictures, and show his flooded 79-acre tract. Most of the State's testimony about observing the overflowing of the County Ditch was for March and June of 1985. The diary of the State's representative indicates a back flow of water from the County Ditch near Claimant's land on May 9, 1985, a Thursday, and that the State plugged the culvert with sandbags at that time.

The Claimant was a credible witness, as was Leland Jones. Their testimony that the flooding in May which destroyed the crops came through the culvert under the Interstate is also credible. The flooding would not have occurred but for the removal of the flap gate.

It has long been established that one who negligently alters the natural flow of water on the property of an adjacent landowner, thereby causing damages, is liable to the adjacent landowner. (*Emerson v. State* (1975), 30 Ill. Ct. Cl. 420; *Sneed v. State* (1988), 40 Ill. Ct. Cl. 80.) Where the State makes negligent changes in highway drainage, the State is liable for damages caused by the increased flow of water onto an adjacent property owner's property. *Sharpe v. State* (1984), 36 Ill. Ct. Cl. 108.

In the present case, all parties agree that a flap gate existed blocking the flow of water from backing up the frontage road ditch, then under the interstate onto Claimant's land. The State was warned of the potential for flooding by Claimant. During the May rains in 1985, Claimant's 79-acre tract was flooded, and Respondent's

efforts to plug the culvert failed to protect Claimant's crop. The State is liable for Claimant's loss.

Claimant presented substantial evidence based on his expertise as a farmer and using publications generally accepted in the farming industry to show his costs. (*Harmon v. State* (1978), 32 Ill. Ct. Cl. 543; *Decker v. State* (1982), 35 Ill. Ct. Cl. 392.) The Claimant's loss was proven to be $10,430.00 and such loss was not speculation but established in a reasonable manner. (*Lopez v. State* (1987), 39 Ill. Ct. Cl. 315.) Respondent correctly points out that this figure must be adjusted down to show the mitigation of damages required by Claimant when he replanted the wheat crop in soybeans. Claimant did not calculate the benefit of that mitigation in determining his loss. Using the estimates of Claimant on his acreage and the value of the soybean crop, Claimant received a benefit of $3,724.00. Therefore, Claimant had actual damages of $6,706.00.

We award the Claimant the sum of $6,706.00 for his damages.

## ORDER DENYING PETITION FOR REHEARING

PATCHETT, J.

This cause comes on for hearing upon the petition for rehearing filed by the Respondent. This Court previously issued an opinion finding liability on the part of the Respondent and granting the claim.

The Respondent's petition for rehearing claims that the opinion rendered herein would tend to make the State liable for cleaning out obstructions and drainage, thereby allowing natural water to flow. Nothing could be further from the truth. The basis of the opinion is that the State altered the natural flow of the ditch in question

when the interstate was built. By building the interstate and installing a culvert, the State altered a natural flow of water.

All the activities which occurred subsequent to that do not alter the fact that the original construction and installation of the culvert altered the natural flow of the water, thereby being the proximate cause of the flood in question. The State presented no evidence to negate this conclusion.

Respondent has now asked for oral argument on the petition for rehearing, but the parties expressly waived oral argument. Therefore, the Court previously considered the case based on the evidence in the record before it. Accordingly, we now deny oral argument on the petition for rehearing. Further, we deny the petition for rehearing.

## ORDER ON PETITION FOR REHEARING

PATCHETT, J.

This cause comes on for hearing upon the Respondent's petition for rehearing. An opinion was rendered in this case on December 7, 1990, granting the claim for the sum of $6,076.00. In the Respondent's petition for rehearing, it erroneously states that the claim was granted on the basis that the State had negligently altered a natural flow of water by removing a flap gate installed by the Claimant. Indeed, the State did remove a flap gate installed by the Claimant, but this act was not the original source of negligence.

The State had negligently altered the natural flow of water by constructing the highway in the first place. After the State had constructed the highway and installed a culvert, the Claimant installed a flap gate to

protect his land. If the Claimant had not installed the flap gate, the State would have been responsible for flooding the Claimant's land at an earlier period.

Therefore, by building the highway and altering the natural flow of water, and then subsequently removing an object used by the Claimant to protect his land from the altered flow of water, the State is clearly negligent. The State is therefore clearly liable for the damage in question. The State originally presented no evidence to tend to negate this finding. Therefore, the petition for rehearing is denied.

## ORDER ON SECOND PETITION FOR REHEARING

PATCHETT, J.

This cause comes on for hearing upon the second petition for rehearing filed herein by the Respondent. For the purposes of this order, the cases of Gordon G. Gass, 87-CC-0569, and of Vic Eckmann, 87-CC-2459, will be consolidated. Originally, opinions were written granting the claims in these cases. The Respondent filed a petition for rehearing in each case. On March 29, 1991, this Court entered an order denying these petitions. In April 1991, the Respondent filed a second petition for rehearing in each case.

The Court has now thoroughly reviewed the pleadings, the original opinion, the first petition for rehearing and order entered therein, and the second petition for rehearing, and the various responses filed by the parties. The Court finds no reason to change its original opinion.

Therefore, the second petition for rehearing is hereby denied.